UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| CARMEN JOHNSON, | Case No. 15-12482 |
| Plaintiff, | SENIOR U.S. DISTRICT JUDGE<br>ARTHUR J. TARNOW |
| v. | U.S. MAGISTRATE JUDGE |
| OAKLAND UNIVERSITY, | STEPHANIE DAWKINS DAVIS |
| Defendant. | |

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [68]**

Plaintiff Carmen Johnson, an African-American woman, filed a Complaint [1] on July 14, 2015 alleging that Defendant Oakland University ("OU") violated Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e-2, by discharging her because of her race.[1]

Defendant filed a Motion for Summary Judgment [68] on June 21, 2017. Plaintiff filed a Response [70] on July 26, 2017. Defendant filed a Reply [72] on August 8, 2017. The Court held a hearing on the Motion on December 19, 2017.

For the reasons stated below, Defendant's Motion for Summary Judgment [68] is **GRANTED**.

---

[1] Plaintiff also brought claims under the Michigan Elliot-Larsen Civil Rights Act (Count II) and for Defamation (Count III), which have since been dismissed.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant OU hired Plaintiff in April 2008 as an Administrative Professional in its School of Nursing's ("SON") Licensed Practical Nursing ("LPN") program.[2] Prior to her employment with OU, Plaintiff earned an MBA and a BSN.

In 2011, Plaintiff was promoted to program director at OU's Riverview Institute location in Detroit, Michigan. At that time, Dr. Barbara Penprase was Plaintiff's supervisor. Penprase, a white woman, is a senior SON faculty member. She has earned a PhD and was a tenured Associate Professor at all applicable times involved in this litigation. Plaintiff reported to Penprase until July 2013.[3]

In 2012, Plaintiff learned that her co-worker, Jackie Glover, had been diagnosed with cancer. In an effort to assist Glover, the SON organized a fundraising event. The fundraiser was a skating party. To encourage participation, Plaintiff sought to offer her students extra credit for their involvement. Plaintiff testified that an unnamed student in the second degree RN program, who worked as a math tutor, suggested to Plaintiff that she give students extra credit in exchange for participation.

---

[2] The LPN program is a non-degree program at OU.
[3] In July 2013, Janean Monahan assumed the role of Executive Director at Riverview and Plaintiff began reporting to her.

Following the conversation with the unnamed student, Plaintiff testified that she asked Penprase whether she was permitted to offer students extra credit for participating in the fundraiser. Plaintiff explained to Penprase that "the students would sell tickets to a fundraiser – to a skating party at $10 each and they would get 10 extra credit points towards their lowest quiz score." Pl. Dep. 46:14-18, Dec. 9, 2015. Plaintiff further testified that Penprase approved of the proposal.

Penprase authorized Plaintiff to give students extra credit for participating in the skating fundraiser for Glover. Penprase testified: "[A]t that time I said if extra credit is given, you can give extra credit but you have to have a variety of different extra credits so students can choose what type of extra credit that they can do." Penprase Dep. 82:17-22, July 19, 2016.

In 2012, OU did not have a written policy prohibiting the award of extra credit to students who participated in fundraisers.

The skating party took place sometime before October 2012. The money raised was given to Glover.

After the success of the first skating party, Plaintiff hosted a second skating party in November 2012. The purpose of the second skating fundraiser was to raise money for teaching supplies, such as simulation dummies. Plaintiff testified that Penprase gave her permission to offer 10 points extra credit to students who sold tickets to the second fundraiser. Pl. Dep. at 80:1-3. Plaintiff gave the proceeds to

Assistant Dean Cheryl McPherson, who directed her to deposit the money with McPherson's assistant.

In April 2013, Plaintiff hosted a third skating party to raise money for teaching supplies and testified that she again sought Penprase's permission to offer extra credit to her students for selling tickets. After the April 2013 skating fundraiser, Dean McPherson told Plaintiff that she "could not collect money [from students] unless [she] had a Student Nurse Association." *Id.* at 69:9-20. Prior to April 2013, McPherson had not communicated to Plaintiff that she should not collect cash from students.

On August 11, 2013, JoeAnna Ingram, an instructor who reported to Plaintiff, hosted a fundraiser for infants with SIDS at the Detroit Zoo, called the "Jungle Jubilee." A $35.00 minimum donation was required, and participation in the activity was worth ten extra credit points.[4] Plaintiff testified that the Jungle Jubilee was "under Ms. Ingram," who received permission from Penprase to offer extra credit in exchange for donations. *Id.* at 75:12-16.

In fall 2013, Plaintiff informed some of her students that they would not be allowed to take the State's Licensing Examination to become a certified LPN because they had twice failed the HESI Examination. Plaintiff submits that several students were angry because they could not sit for the Exam.

---

[4] Ingram also hosted a fundraiser at Hines Park in September 2012. Ingram offered her students five extra credit points for "participation and a $5.00 donation."

A group of students complained to Monahan (who had replaced Penprase in 2013) about being "forced" to participate in the skating fundraisers. Monahan testified that she received grievances from approximately 12-14 students, complaining "about not having enough money to obtain extra credit." Monahan Dep. 11:16-17; 12:18-19, Feb. 2, 2017.

Monahan took the students' concerns to the Dean. In November 2013, David Vartanian, an internal auditor at OU, began an investigation of Plaintiff and Ingram in response to the students' complaints. Vartanian testified that he dedicated 750 hours to the investigation.[5] Vartanian Dep. 11:17-18, June 29, 2016. As part of the investigation, Vartanian interviewed five students who complained about "having to pay cash for extra credit." Vartanian also interviewed Penprase. Vartanian's notes and testimony indicate that he was aware of Penprase's approval of some fundraising activities.

On December 3, 2013, Plaintiff was placed on paid suspension for alleged misconduct. On December 9, 2013 and December 13, 2013, Vartanian, along with other OU faculty, interviewed Plaintiff.

On January 5, 2014, Vartanian emailed OU Provost, James Lentini, stating, "from Internal Audits standpoint the matter is academic misconduct regarding the

---

[5] In addition to investigating the "payment for extra credit" scheme, Vartanian investigated Plaintiff for: cash irregularities; salary enhancement; unprofessionalism; timecard falsification; and other matters.

offer of cash payments for extra credit . . . . I believe UHR and AHR need to make a decision." [Dkt. #68-32].

Also in January 2014, a meeting took place at which Vartanian presented his findings to the Provost. Vartanian did not inform the Provost that Penprase had approved of some of Plaintiff's fundraising activities.

In February 2014, upon the close of the investigation, Plaintiff was given the opportunity to voluntarily resign, but declined. On February 7, 2014, Defendant terminated Plaintiff for misconduct.

The parties do not dispute that the Provost made the final decision to fire Plaintiff and that he was unaware of Plaintiff's race when he discharged her. The Provost testified that the "extra credit as a result of fundraising" was the "prime factor in [his] understanding of the situation." Dep. Lentini 45:5-12, May 8, 2017.

On February 19, 2014, OU hired an African-American woman to replace Plaintiff.

Prior to instituting this action, Plaintiff filed a charge with the Equal Employment Opportunity Commission (EEOC) alleging racial discrimination. On April 30, 2015, the EEOC sent a letter to Plaintiff indicating that it could not determine whether Defendant had violated Title VII and informing Plaintiff that she had 90 days to commence a Title VII lawsuit. Compl. at ¶ 3.

On July 14, 2015, Plaintiff filed a Complaint [1] alleging that Defendant intentionally discriminated against her on the basis of race in violation of Title VII. Plaintiff seeks monetary damages and reinstatement.

On June 21, 2017, Defendant filed the instant Motion [68], asking that the Court grant summary judgment because Plaintiff has not set forth a claim for racial discrimination.

Plaintiff does not dispute that she offered students extra credit for selling tickets or donating to charity events, but maintains that "she should not be punished for giving extra credit for fundraising when her white supervisor approved it and where no written policies prohibiting it [sic] the practice [sic]." [Dkt. #70 at 24].

**LEGAL STANDARD**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue for trial exists if "the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## ANALYSIS

"Individual disparate-treatment claims brought pursuant to . . . 42 U.S.C. § 2000e–2, are often categorized as either single-motive claims, i.e., when an illegitimate reason motivated an employment decision, or mixed-motive claims, when 'both legitimate and illegitimate reasons motivated the decision[.]'" *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 711 (6th Cir. 2006) (internal citation omitted).

A single-motive claim premised on circumstantial evidence is subject to the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) tripartite burden-shifting framework. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008). Under the *McDonnell Douglas* framework, "[t]he burden is first on the plaintiff to demonstrate a prima facie case of race discrimination; it then shifts to the employer to offer a legitimate, non-discriminatory explanation for its actions; finally, the burden shifts back to the plaintiff to show pretext-i.e. that the employer's explanation was fabricated to conceal an illegal motive." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009).

Pursuant to 42 U.S.C. § 2000e-2(m), a plaintiff may also bring a mixed-motive Title VII claim.[6] To defeat a motion for summary judgment on this theory, a claimant "need only produce evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) race . . . was a motivating factor for the defendant's adverse employment action." *White*, 533 F.3d at 400 (internal citation and quotation marks omitted). The *McDonnell Douglas* framework is inapplicable to a summary judgment analysis of a mixed-motive claim. *Id.*

In this case, Plaintiff has not presented direct evidence of racial discrimination. Both parties appear to share the mistaken belief that direct evidence is required to establish a mixed-motive claim. But, the Sixth Circuit has clarified that "it is irrelevant, for purposes of a summary judgment determination, whether the plaintiff has presented direct or circumstantial evidence in support of the mixed-motive claim . . . ." *Id.*

At the hearing, Defendant erroneously argued that Plaintiff's claim is strictly subject to the *McDonnell Douglas* framework because Plaintiff offers only

---

[6] By asserting this theory in her Response [70], Plaintiff has provided adequate notice of her mixed-motive claim. *See Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 649 (6th Cir. 2012) (explaining that the plaintiff "gave adequate notice of mixed-motive claims in her response to [the defendant's] motion for summary judgment.").

circumstantial evidence in support of her claim. However, because Plaintiff invokes a mixed-motive claim based on circumstantial evidence, the Court conducts separate analyses of Plaintiff's single-motive and mixed-motive claims.

Additionally, Plaintiff submits that her claim is based on a cat's paw theory of liability because Vartanian, and not the Provost, engaged in racial discrimination.

The Sixth Circuit has declined to rule on "whether and to what extent cat's paw liability fits into the [*McDonnell Douglas*] framework." *DeNoma v. Hamilton Cnty. Ct. of C.P.*, 626 F. App'x 101, 105 (6th Cir. 2015). Furthermore, the Court is unaware of a Sixth Circuit ruling on whether and to what extent the cat's paw analysis fits into the mixed-motive analysis.

Accordingly, the Court first evaluates Plaintiff's single-motive claim under the *McDonnell Douglas* framework. The Court then assesses Plaintiff's mixed-motive claim under the *White* framework. As part of its assessment of the mixed-motive claim, the Court analyzes Plaintiff's cat's paw argument. Ultimately, the Court concludes that summary judgment is warranted because Plaintiff has neither met her burden of establishing a single-motive nor mixed-motive claim for racial discrimination.

## I. Single-Motive Claim

To establish a prima facie case of employment discrimination, Plaintiff must demonstrate that she: (1) is a member of a protected class; (2) was qualified for the job; (3) suffered an adverse employment decision; and (4) was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees. *Arendale v. City of Memphis*, 519 F.3d 587, 603 (6th Cir. 2008).

It is undisputed that Plaintiff, an African-American woman, is a member of a protected class, and that her discharge constitutes an adverse employment decision. Nevertheless, Defendant argues that Plaintiff cannot set forth a prima facie case of racial discrimination because she was neither (1) treated differently than similarly situated non-black employees nor (2) qualified for the position. Defendant further argues that Plaintiff's claim fails as a matter of law because OU replaced her with an African-American employee.

### A. Plaintiff and Penprase are not similarly situated employees

To set forth a prima facie case for discrimination, the claimant must show that she is similarly situated to an employee outside of her protected class in all respects. *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992) (explaining that similarly situated employees "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same

conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.").

"In the disciplinary context . . . the plaintiff and [her] proposed comparator must have engaged in acts of '*comparable seriousness.*'" *Wright*, 455 F.3d at 710. "To determine whether two individuals are similarly situated with regard to discipline, [the court] make[s] an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the [proposed comparable] employee." *Id.* (internal quotation marks omitted). In its assessment of the seriousness of the employee's acts, the Court may consider the aforementioned *Mitchell* factors. *See Colvin v. Veterans Admin. Med. Ctr.*, 390 Fed. App'x 454, 458 (6th Cir. 2010).

Plaintiff and Penprase are not similarly situated employees with regard to discipline. As an initial matter, Plaintiff was an Administrative Professional, while Penprase was a tenured Associate Professor. Furthermore, Plaintiff and Penprase were subject to different standards and had different supervisors. A non-contractual administrative personnel manual governed Plaintiff's terms and conditions employment, while a collectively bargained contract between OU and the American Association of University Professors governed Penprase's employment. Penprase and Monahan were Plaintiff's supervisors. Shulling was Penprase's supervisor.

Plaintiff has failed to demonstrate that she and Penprase were similarly situated in all respects. Moreover, Plaintiff has failed to identify by name any other OU employee who engaged in acts of comparable seriousness, but nevertheless faced lesser consequences than she. Accordingly, Plaintiff cannot establish a prima facie case for racial discrimination.

### B. Plaintiff was replaced by a member of her protected class

It is undisputed that OU replaced Plaintiff with an African-American woman. Defendant submits that Plaintiff's claim fails as a matter of law because the Court may not draw an inference of racial discrimination where one African-American employee is replaced with another African-American employee. *See O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 313 (1996) (holding that "[i]n the age-discrimination context, [an inference that an employment decision was based on an illegal discriminatory criterion] cannot be drawn from the replacement of one worker with another worker insignificantly younger."). Defendant maintains that this fact is fatal to Plaintiff's claim.[7]

---

[7] Defendant further cites to Sixth Circuit cases to support this argument. *See, e.g.*, *Kraemer v. Luttrell*, 189 F. App'x 361, 368 (6th Cir. 2006) (holding that the plaintiff, who was African-American, failed to satisfy the "fourth element of the prima facie case because three other members of the same protected class did receive promotions to lieutenant."); *Jones v. Butler Metro. Hous. Auth.*, 40 F. App'x 131, 136 (6th Cir. 2002) (holding that the plaintiff, who was an African-American woman, failed to establish a prima facie case where she was replaced by an African-American woman).

Plaintiff argues that "it means nothing" that she was replaced by an African-American woman because she need only prove disparate treatment of a similarly situated employee outside of her protected class to set forth a prima facie case of discrimination.

Plaintiff correctly notes that she may establish a prima facie case by demonstrating either that she was replaced by someone outside of her protected class or that a similarly situated employee outside of her protected class was treated more favorably than she. *See Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 655 (6th Cir. 2015).

However, Plaintiff erroneously submits that the issue of replacement "means nothing." Although replacement by someone outside of her class is not necessary for establishing a prima facie case, it is nevertheless relevant in inferring discriminatory treatment. Plaintiff fails to show how the Court may draw an inference of racial discrimination where her employer replaced her with an African-American woman. Because Plaintiff has failed to satisfy all elements of a single-motive racial discrimination claim, the Court need not decide whether the issue of replacement alone is fatal to Plaintiff's claim.

## II. Mixed-Motive Claim

To establish a mixed-motive racial discrimination claim, Plaintiff must present evidence to convince a jury that: (1) Defendant took adverse employment

action against her; and (2) race was a motivating factor for Defendant's adverse employment action. *White*, 533 F.3d at 400. Plaintiff's burden in supporting a mixed-motive claim is not onerous; courts should grant summary judgment only "where the record is devoid of evidence that could reasonably be construed to support the plaintiff's claim." *Id.*

The Court need only assesses whether race was a motivating factor in Plaintiff's termination.[8] Plaintiff argues that a reasonable jury could conclude that race was a motivating factor in Vartanian's investigation and presentation to the Provost. Plaintiff alleges only that Vartanian, the internal auditor who conducted the investigation, unlawfully discriminated against her because she is black. Since Plaintiff does not allege that the Provost (the individual responsible for the termination decision) engaged in unlawful discrimination, Plaintiff must also satisfy the elements of the cat's paw theory of liability.

Under the cat's paw theory, "if a supervisor performs an act motivated by [racial] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable." *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011).

"The intent element is satisfied if the supervisor believes the adverse action substantially certain to result from his act." *DeNoma*, 626 F. App'x at 105 (internal

---

[8] The first prong of the mixed-motive analysis was satisfied by Plaintiff's discharge. *See Weatherby v. Fed. Exp.*, 454 Fed. App'x 480, 486 (6th Cir. 2012).

citation omitted). Furthermore, the proximate cause element is not stringent, and "excludes only those link[s] that are too remote, purely contingent, or indirect." *Id.* (internal quotations omitted).

Plaintiff has satisfied the intent element. Vartanian conducted a 750-hour investigation of Plaintiff's activities. Following the investigation, he explicitly told the Provost that he "believe[s] UHR and AHR need to make a decision." The primary purpose of the investigation was to determine whether the students' complaints had merit and to discipline Plaintiff if necessary. Accordingly, Vartanian could have been "substantially certain" that Plaintiff would be disciplined for her actions.

Moreover, Plaintiff has satisfied the proximate cause requirement. Although Vartanian may not have recommended Plaintiff's termination, Vartanian presented his findings to the Provost and "brought these issues to light." The Provost's decision to fire Plaintiff was based almost entirely upon Vartanian's findings that Plaintiff offered extra credit for fundraising or cash payments.

However, a reasonable jury could not find that Vartanian's acts were motivated by racial animus (as required under the cat's paw analysis) and that race was a motivating factor in her termination (as required to set forth a mixed-motive claim under *White*).

In an attempt to support her argument, Plaintiff refers to several instances in which Vartanian treated Plaintiff differently than he treated Penprase. In particular, Plaintiff maintains that Vartanian demonstrated racial bias when he:

> (1) [told the Provost that] the Plaintiff, a black woman had given extra credit for fundraising participation, but did not tell him that Dr. Penprase, a white woman, had authorized giving extra academic credit and had suggested how much credit to give; (2) accused the Plaintiff of time card fraud, without a speck of evidence supporting said claim and not telling the Provost that he also considered Barbara Penprase to be a co-conspirator in the time card fraud . . . [and] (3) [told the Provost that] the Plaintiff had received improper salary enhancement . . . without telling [him] that Dr. Penprase made the decision to pay the Plaintiff an enhanced salary . . .

[Dkt. #70 at 24].

Plaintiff further maintains that Vartanian "accused" her of engaging in other prohibited conduct in which Penprase was involved,[9] but only shared with the Provost Plaintiff's involvement in such activities because of her race.

Defendant's disparate treatment of Plaintiff and Penprase is practically the only evidence Plaintiff offers to support her mixed-motive claim. As an initial matter, Vartanian was charged with investigating Plaintiff, not Penprase, as a result of the students' complaints regarding her extra credit scheme.

---

[9] The alleged prohibited conduct includes: cash irregularities, salary enhancement, unprofessionalism, and timecard falsification.

Moreover, to the extent that Plaintiff alleges discriminatory motive based on disparate treatment, she would be required to demonstrate that [she and Penprase] "are nearly identical in all relevant aspects." *See Alomari v. Ohio Dep't of Pub. Safety*, 626 F. App'x 558, 565 (6th Cir. 2015), *cert. denied*, 136 S. Ct. 1228, 194 L. Ed. 2d 185 (2016). As described in Section I-A of this Order, Plaintiff has made no such showing here.

Furthermore, other than her own speculation, Plaintiff has not provided any objective evidence "indicating that [Vartanian] harbored animus against African-Americans." *See Reed v. Procter & Gamble Mfg. Co.*, 556 F. App'x 421, 429 (6th Cir. 2014). Moreover, Plaintiff "makes no claim that any [OU] employee ever directly made any race-based comment to her, or any comment that she interpreted to be motivated by racial bias." *See Weatherby*, 454 F. App'x at 487. Finally, the thoroughness of Vartanian's 750-hour investigation further weighs against a finding that race factored into the termination decision. *See Curry v. SBC Commc'ns, Inc.*, 669 F. Supp. 2d 805, 830 (E.D. Mich. 2009). Thus, Plaintiff has not met her minimal burden of demonstrating that a reasonable jury could conclude that race was a motivating factor in her termination.

## CONCLUSION

Accordingly,

**IT IS ORDERED** that Defendant's Motion for Summary Judgment [68] is **GRANTED**.

**SO ORDERED**.

<br>

                                                  s/Arthur J. Tarnow  
                                                  Arthur J. Tarnow  
Dated: January 22, 2018          Senior United States District Judge